**Franklin EMMONS et ux., Appellants,**

**v.**

**James PETRY et al., Appellees.**

**No. 7424.**

Court of Civil Appeals of Texas, Beaumont.

July 26, 1973.

Rehearing Denied Aug. 16, 1973.

John L. Russell, Ragan, Russell & Rorschach, Houston, for appellants.

John G. Tucker, Orgain, Bell & Tucker, Kenneth Lee Parker, Strong, Pipkin, Nelson, Parker & Powers, Dewey Gonsoulin and James W. Mehaffy, Sr., Mehaffy, Weber, Keith & Gonsoulin, Beaumont, for appellees.

STEPHENSON, Justice.

This is an action to recover damages for personal injuries sustained based upon allegations of medical malpractice. Judgment was rendered for defendants upon the jury findings. The parties will be referred to here as they were in the trial court or by name.

Plaintiffs, Frank Emmons and wife, brought this suit against defendants, Dr. James L. Petry, Park Place Hospital, Inc.,

and its employee, a male nurse named Gus Gonzales. Dr. Walter W. Glass, Jr. (not a party to this suit) performed back surgery upon plaintiff Franklin Emmons on October 20, 1966. Certain complications connected with the urinary system set in and Dr. Glass called in defendant Petry, a urologist. It was the post surgical care by defendant Petry while plaintiff was in the defendant hospital that resulted in this suit being filed. According to plaintiffs' allegations, the injuries were caused by the negligence of these defendants and by their treatment in a manner contrary to accepted practices and standards of the medical profession in the community. The specific allegations surrounded the catheterization of Emmons on October 26, 1966, resulting in urethritis and an injury to the erectile tissue of the dorsal end of the penis. Plaintiffs alleged that such injuries resulted in the permanent prevention of sexual intercourse and the passage of urine by a small artificial opening at the base of the penis.

■ The law is clear in this state that in order to recover damages from a doctor in a malpractice case, the plaintiff must prove that the medical treatment complained of constitutes negligence, was a proximate cause of the injuries, and, further, that proof of both must be made by expert evidence. Hart v. Van Zandt, 399 S.W.2d 791 (Tex.1966); Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779 (1949).

■ Plaintiffs' primary complaint is concerning the method of submission of the case to the jury. The court's charge contained forty-four special issues. However, the last forty-two special issues were to be answered only if there was an affirmative answer to either Special Issue No. 1 or No. 2. Those two special issues read as follows:

"SPECIAL ISSUE NO. 1

"Do you find from a preponderance of the evidence that the stricture sustained by Franklin Emmons was proximately caused by an unusual injury to his urethra on October 26, 1966, by the attempts to insert the foley catheter by Gus Gonzales?

"Answer 'we do' or 'we do not'."

"You are instructed that by the term 'unusual injury to his urethra' is meant an injury greater than that which would reasonably be expected as a result of the catheterization under the circumstances then and there existing.

"SPECIAL ISSUE NO. 2

"Do you find from a preponderance of the evidence that on October 26, 1966, Franklin Emmons suffered an injury to the erectile tissue on the dorsal or upper side of the penis by the attempt to insert the foley catheter by Gus Gonzales?

"Answer 'we do' or 'we do not'."

"By the term 'injury' as used in the foregoing Special Issue, is meant injury to the erectile tissue of the penis by tearing through the urethra and blood accumulating in the adjacent erectile tissue and forming scar tissue, and it does not refer to the development of Peyronie's disease.

"You are instructed that if you have answered either Special Issue No. 1 or Special Issue No. 2 'we do', then you should answer the following Special Issues:"

The jury answered both of these issues in the negative and none of the other special issues were answered.

Plaintiffs' specific complaints are: (1) This method of submission informed the jury of the effect of their answers. (2) This was not an unconditional submission of their theories of recovery. (3) This method of submission amounts to a general charge or global submission.

No objection was made in the trial court specifically complaining about the use of

the word "unusual" before the word "injury". All of the medical witnesses agreed that any time a catheter is inserted, there is a certain amount of urethral damage.

This case is controlled by Westinghouse Electric Corp. v. Pierce, 153 Tex. 527, 271 S.W.2d 422 (1954). The first special issue asked whether plaintiff's injuries were directly and proximately caused in a certain manner and all of the negligence and proximate cause issues were conditioned upon an affirmative answer to the first issue. The jury answered the first issue in the negative and on appeal plaintiff complained about the method of submission. The Supreme Court affirmed the judgment of the trial court and made these statements after illustrating the usual manner of submitting a negligence case:

"In this case, however, plaintiff's allegations of negligence and proximate cause were inextricably tied in with his allegations of the manner in which the injury occurred.

\* \* \* \* \* \*

"His pleading and testimony was to the effect that he sustained his injury while sitting at a distance of four or five feet from the lamp for a period of about five minutes. The testimony of his expert witnesses was that he could and probably did sustain his injury from use of the lamp in that manner. He had no pleading or testimony that his injury resulted from use of the lamp in any other manner.

\* \* \* \* \* \*

"The simple, direct and controlling manner of submitting this case was followed by the trial judge and we cannot conclude that in adopting that method of submission he committed reversible error. The issue was submitted in language almost identical with that used by the plaintiff in his pleading." Westinghouse Electric Corp. v. Pierce, supra, 271 S.W.2d at 425, 426

We have carefully examined the pleadings in this case and find that in their Sec-ond Amended Original Petition, although plaintiffs had many allegations of negligence on the part of these defendants, the only allegation as to the manner in which Franklin Emmons sustained his injuries was the attempt by Gus Gonzales to insert the catheter about 1:00 p. m. on October 26, 1966. The testimony given by plaintiffs and their expert witnesses would have supported jury findings contrary to those made, but none of such testimony was to the effect that the injuries resulted in any other manner than from the attempt by Gus Gonzales to insert the catheter. Further, an examination of the nine sets of issues contained in the charge in the case before us shows that none of those requested issues was inconsistent with such manner of injury. In the words of the Pierce case, all of the acts of negligence relied upon by plaintiffs in their pleadings and requested issues "were inextricably tied in with [their] allegations of the manner in which [this] injury occurred." These points of error are overruled.

■ Plaintiffs have points of error in which it is urged that there is no evidence to support the jury's answer to Special Issue No. 1 and that such answer is against the overwhelming weight and preponderance of the evidence. We pass upon the "no evidence" point by considering only the evidence favorable to such answer and the entire record in considering the "great weight and preponderance of the evidence" point.

The question of whether plaintiff Franklin Emmons received an unusual injury in the manner alleged was a controverted issue of fact. Proof of that issue was therefore essential to plaintiffs' cause of action. Plaintiffs had the burden of securing a favorable finding upon such issue. Hart v. Van Zandt, supra. As stated, the jury answered the question in the negative. A negative answer, when properly interpreted, amounts to nothing more than a failure or a refusal by the jury to find from a preponderance of the evidence that plaintiffs sustained an unusual injury in the

manner alleged and means in law that plaintiffs failed to discharge the burden of proving that fact. C. & R. Transport, Inc. v. Campbell, 406 S.W.2d 191 (Tex.1966). It does not mean that the jury found he did not sustain an unusual injury in the manner alleged. It simply means that the jury was not persuaded by a preponderance of the evidence.

The records of defendant hospital were accepted in evidence and, among other things, showed the following: that plaintiff Franklin Emmons was operated upon on October 20, 1966 by Dr. Glass; that on October 21, 1966 Dr. Glass ordered that plaintiff be catheterized; that on October 21, 1966 at 11:40 a. m., plaintiff was catheterized by a French catheter and then at 1:40 p. m., a Foley catheter was inserted as ordered; that on October 23, 1966 they were having trouble with the Foley catheter; that the Foley catheter was in until removed at 10:30 a. m. on October 24, 1966; that on October 25 plaintiff was complaining of burning on urination and was having a small amount of bleeding around the penis; that compresses were applied to his penis all day October 25 at Dr. Glass' order; that Dr. Glass called in Dr. Petry, a urologist, whose consultation report on October 25 showed that "this patient evidently has a rather marked anterior urethritis probably due to trauma due to insertion of the catheter . . . "; that at 5:20 a. m. on October 26 a Foley catheter was easily inserted by Nurse Supervisor Domec; that at 9:00 a. m. that day the Foley catheter was removed and at 1:40 p. m. the Foley catheter was back in, inserted by John Freeman; that the Foley catheter was then removed at 10:15 a. m. on October 28. It is noted that the hospital records made no mention of an attempt by Gus Gonzales to insert a catheter between one and two o'clock on the afternoon of October 26, 1966.

Defendant Gonzales testified that he was a registered nurse, had been one since 1951, and was trained to perform catheterizations. This trial began March 20, 1972, some five and a half years after the incident, and Gonzales had no recollection of the incident. He did not remember having any trouble with a male patient in October, 1966 because of bleeding and having to get someone else to insert the catheter. He did not remember ever catheterizing a man at Park Place Hospital who started bleeding.

Dr. Gordon Healey, a urologist, was called as a witness by plaintiffs and testified: that any catheter placed in any patient causes a certain amount of irritation; that the urethra is a sensitive area which is irritated when a foreign body comes in contact with it and if irritated enough, will bleed; that the most common cause of stenosis or a complete blocking of the urethra is gonorrhea; that the period of time between the occurrence of gonorrhea and the development of stenosis is from five to ten years or longer; that occasionally you get a stricture from urethritis from catheterization, but not frequently.

Dr. James R. Thomas, a general surgeon, was called by plaintiffs and testified: that it is impossible to put anything in the urethra without some irritation; that every single catheterization results in urethritis in some degree because urethritis by its definition is an infection or inflammation of the urethra; that regardless of how carefully the catheterization is performed, urethritis may develop into a stricture; that gonorrhea · oftentimes causes strictures; that it appeared from the hospital records that plaintiff had urethritis before Gus Gonzales ever saw him; that it was impossible to say which catheterization produced the urethral stricture.

Defendant Petry testified: that plaintiff was having urinary difficulty when he first saw him on the morning of October 25; that the opening of the urethra was red, inflamed and bloodtinged and his diagnosis was urethritis; that you get an inflammation of the urethra in all cases of catheterization; that there is some damage to the urethra any time a catheter is put

in; that you have varying degrees of damage when you insert a Foley catheter; that plaintiff might have had a mild stricture when he first saw him; that about five percent of catheterizations cause strictures; that if plaintiff had a gonorrheal infection in November, 1945, there could be a connection for it has been well recorded that gonorrhea, even twenty to twenty-five years before, can cause a stricture; that plaintiff Emmons' medical records showed he had been treated with penicillin for acute gonorrhea while in the military service; that every single time a catheter is inserted, regardless of how skillfully or by whom it is done, you are going to get a trauma.

Dr. Glenn T. Holmes, a medical doctor specializing in urology, testified: that catheterization of a male urethra produces urethritis every single time; that the continued presence of the catheter leads to a more severe degree of urethritis than simply passing the catheter and then removing it; that he would think that the stricture would be due to the continued presence of the catheter and not to any act of any individual who performed the catheterization.

Dr. Russell Scott, Jr., a medical doctor specializing in urology and head of the Division of Urology at Baylor Medical School in Houston, testified: that he examined plaintiff Emmons on July 12, 1968 and found a urethral stricture; that the urethral stricture was related to the urethritis which in turn was related to the catheterization; that in his opinion, the stricture came from the urethritis and not from the attempted insertion of the catheter by Gus Gonzales.

All of the foregoing evidence supports the jury's answer to Special Issue No. 1. Both plaintiffs testified in much detail about the attempt made by Gus Gonzales to insert the catheter but such evidence did no more than raise an issue of fact for the jury to determine, which it did adversely to plaintiffs. These points of error are overruled.

Plaintiffs have no evidentiary points of error attacking the jury's negative answer to Special Issue No. 2.

We have carefully examined plaintiffs' remaining points of error and, finding them to be. without merit, they are overruled.

Affirmed.